

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-19-2000

# United States v. Simmonds

Precedential or Non-Precedential:

Docket 99-3524

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Simmonds" (2000). *2000 Decisions.* Paper 253.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/253

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 14, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3524

UNITED STATES OF AMERICA

v.

JOSEPH EMMETT SIMMONDS, III,

      Appellant

Appeal from the District Court of the V irgin Islands
(Division of St. Thomas and St. John)
D.C. Criminal Action No. 98-cr-00238-1
District Judge: Honorable Thomas K. Moore

Argued April 11, 2000

Before: SLOVITER, ROTH and STAPLETON, Circuit Judges

(Opinion filed December 14, 2000)

        James K. Robinson, Esquire
        Assistant Attorney General
        Mark Healey Bonner, Esquire
         (Argued)
        Trial Attorney, Criminal Division
        United States Department of Justice
        601 D Street, NW Suite 6500
        Washington, DC 20530

         Attorneys for Appellee

        John H. Benham, Esquire (Argued)
        William J. Glore, Esquire
        Watts & Benham, P.C.
        No. 1 Frederiksberg Gade
        P.O. Box 11720
        Charlotte Amalie, St. Thomas
        USVI, 00801-4720

         Attorneys for Appellant

OPINION OF THE COURT

ROTH, Circuit Judge:

Joseph Emmett Simmonds, III, pled guilty in the District Court of the Virgin Islands to one count of arson in violation of federal law and to one count of bur glary in violation of Virgin Islands territorial law. Simmonds contends on appeal that the District Court: (1) miscalculated the appropriate amount of r estitution by including the value of the victims' lost insurance premium discounts and the depreciation attributable to the victims' furniture in its restitution or der, (2) abused its discretion by ordering him to serve consecutive (rather than concurrent) sentences for his crimes, and (3) committed plain error by consulting the Pre-Sentence Investigation Reports of his co-defendants before sentencing him. For the reasons detailed below, we will reverse the District Court's restitution order with respect to the inclusion of the victims' lost insurance premium discounts, but we will affirm the District Court's decision in all other respects.

I. FACTS

On September 16, 1998, Simmonds, along with five other men, drove to the Peterborg area of St. Thomas, intending to burglarize the house located at 11-22 Peterborg. Simmonds and his five co-defendants cased the house and, after concluding that the residents wer e not at home, cut the alarm system wiring which activated both an audible alarm within the home and an alert at ADT Security

Systems, the monitoring company. All but one of the men then entered the house through a partially open window.1

While searching the house for items to steal, one of the men, Adaryll Gumbs, came upon the credentials of Assistant U.S. Attorney Curtis Gomez and r ealized that the house belonged to Gomez. Gumbs recognized Gomez's name because Gomez had prosecuted Gumbs in a r obbery case that was still pending in the Vir gin Islands Territorial Court. On discovering that the house belonged to Gomez, Gumbs and Simmonds searched the house for documents pertaining to the case against Gumbs. After an unsuccessful search, Gumbs and Simmonds decided to set the house on fire. Gumbs directed the other three men to leave the house and turned on the gas stove without igniting the burners. Gumbs and Simmonds then cut up a couch and set the couch on fire. All six menfled the scene. Gomez and St. Thomas police officers, responding to notification of the alarm from ADT , arrived in time to observe the suspects fleeing the scene.

All six suspects were eventually arrested. Simmonds was arrested on November 9, 1998. During questioning, Simmonds confessed to his involvement in the bur glary and the arson and gave the police a statement implicating the other five men. Simmonds was charged with arson in violation of 18 U.S.C. S 844(i), carrying afirearm during the commission of a violent crime in violation of 18 U.S.C. S 924(c)(1), and possession of a fir earm by an unlawful user of a controlled substance in violation of 18 U.S.C. S 922(g)(3). He was also charged with burglary in violation of territorial law, 14 V.I.C. S 444. In exchange for Simmonds' pleading guilty to arson and burglary, the government dropped the other char ges against him and agreed to recommend to the sentencing court a downward adjustment for acceptance of responsibility. On May 18, 1999, Simmonds was sentenced to 97 months in prison for violation of 18 U.S.C. S 844(i) (arson) and a consecutive sentence of 5 years in prison for violation of 14 V .I.C. S 444

_____

1. At least two of the six men were ar med. Adaryll Gumbs was armed with a .22 caliber handgun given to him by Simmonds, and Simmonds himself was armed with a .38 caliber chr ome plated handgun.

3

(burglary). Simmonds was also order ed to pay restitution to the victims in the amount of $20,000. Simmonds appealed the sentence imposed.

II. JURISDICTION & STANDARD OF REVIEW

The District Court of the Virgin Islands had subject matter jurisdiction in this case pursuant to 48 U.S.C. S 1612, which grants the District Court for the Virgin Islands concurrent jurisdiction over criminal matters that involve violations of both federal and territorial law. We have appellate jurisdiction pursuant to 28 U.S.C.S 1291 and 18 U.S.C. S 3742(a), which grant us the power to review on appeal certain federal sentencing decisions.

We review a restitution order"under a bifurcated standard: plenary review as to whether r estitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award." United States v. Crandon, 173 F.3d 122, 125 (3d Cir . 1999). With respect to Simmonds's claim that the District Court err ed by awarding the "replacement value" of the destr oyed furniture, we apply plenary review to the issue of whether"value" includes "replacement value." See United States v. Shugart, 176 F.3d 1373, 1375 (11th Cir. 1999). If we determine that "replacement value" is permitted under the statute, we then review the District Court's factual basis for choosing "replacement value," as opposed to "market value," for abuse of discretion. See id.

With respect to Simmonds's contention that as a matter of law the District Court erred by including in its restitution order the value of the victims' lost "clean renewal discount" and "no claim discount" from their insurance premiums, we exercise plenary review. See Crandon , 173 F.3d at 125.

We review the District Court's decision to impose a consecutive, rather than a concurrent, sentence for abuse of discretion. See, e.g., United States v. Spiers, 82 F.3d 1274, 1277 (3d Cir. 1996). The issue underlying that decision, however, i.e., whether the Sentencing Guidelines apply to the overall sentence imposed when a defendant is sentenced simultaneously for a territorial and a federal offense, is an issue of law and our review is plenary.

4

Finally, because Simmonds did not contemporaneously object to the District Court's decision to consult his co-defendants' Pre-Sentence Investigation Reports at sentencing, our review is for plain err or. See, e.g., United States v. Knobloch, 131 F.3d 366, 370 (3d Cir. 1997).

III. DISCUSSION

A. The District Court's Restitution Or der

Pursuant to the Mandatory Victims Restitution Act (the "MVRA"), codified at 18 U.S.C. S 3663A, the District Court ordered Simmonds to pay $20,000 as his share of the restitution owed to the victims and to the victims' insurance company. The District Court concluded that the total loss resulting from the criminal acts in question was $76,454. The court arrived at this sum based on information contained in Simmonds's Pr e-Sentence Investigation Report. The victims' insurance company paid a total of $65,939 for the loss caused by the fir e. In addition, the court ordered restitution in the amount of $2,000 to cover the insurance deductible paid by the victims, $7,000 representing the depr eciation attributable to the furniture destroyed in thefire, and $1,516 representing the "clean renewal discount" and "no claim discount" lost as a result of the insurance claim filed by the victims. Simmonds argues that the District Court erred by requiring him to compensate the victims for the depreciation attributable to furnitur e destroyed in the fire and for the value of the lost "clean renewal discount" and "no claim discount" because the District Court is prohibited by statute from awarding this type of r estitution.

As its name suggests, the Mandatory Victims Restitution Act, which was enacted by Congress in 1996, mandates that defendants who are convicted of or plead guilty to certain crimes pay restitution to their victims. See 18 U.S.C. S 3663A(a)(1). The parties agree that Simmonds is subject to the provisions of the MVRA by virtue of his guilty plea to the federal offense of arson. Under the MVRA, a defendant must either return the pr operty damaged during commission of the crime in question or, if the defendant cannot do so, pay "an amount equal to the gr eater of the

5

value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of sentencing, less the value (as of the date the pr operty is returned) of any part of the property that is returned." 18 U.S.C. S 3663A(b)(1)(B) (emphasis added). Because the property at issue in this case was destr oyed, returning it is impossible. Therefore, we must deter mine whether the District Court's inclusion of the depreciation attributable to furniture destroyed in the fir e and of the value of the victims' lost insurance premium discounts was proper under the statute. We will consider each of the items in turn.

1. The Depreciation Attributable to the Victims' Furniture

We first consider whether the District Court erred in calculating the value of the victims' furnitur e destroyed in the fire under S 3663A at its "r eplacement value" rather than at its "market value." "Market value" refers to the actual price that the furniture in question would have commanded on the open market on the date of destruction. "Replacement value," in contrast, refers to the amount of money necessary to replace the furnitur e. "Replacement value" exceeds "market value" by an amount equal to the depreciation attributable to the furnitur e. Depreciation represents a decrease in the value of the victims' furniture due to use and reflects the fact that the victims' furniture was no longer new when destroyed.

Pursuant to the victims' homeowners insurance policy, their insurance company, Lloyd's of London, compensated the victims for the market value of their destr oyed furniture. The District Court, in opting for the "replacement value," ordered Simmonds to pay r estitution to Lloyd's of London in an amount equal to the market value of the furniture and to pay restitution to the victims in an amount equal to the depreciation attributable to their furniture. The sum of these two amounts, the market value of the furniture and the depreciation attributable to the furniture, is equal to the replacement value of the fur niture.

Simmonds argues that by including the depr eciation attributable to the furniture in its r estitution order, the District Court exceeded its statutory authority to order

6

restitution in an amount equal to "the value of the property on the date of . . . destruction." 18 U.S.C. S 3663A(b)(1)(B)(i)(I). We must, therefore, determine whether the District Court's decision to order restitution in an amount equal to the "replacement value," rather than equal to the "market value," of the destroyed furniture was proper under S 3663A.

This question is one of first impression in the Third Circuit. In arguing that the District Court's restitution order was proper, the government relies primarily on the legislative history of the MVRA and the Victim Witness Protection Act (the "VPWA"), 18 U.S.C. S 3663(b)(1), as well as case law interpreting the language of the VPWA,[2] all of which indicate that the purpose of both the VPWA and the MVRA is, to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being. See, e.g., United States v. Kress, 944 F.2d 155, 159-60 (3d Cir. 1991); S. Rep. No. 104-179, at 12-13, 17-22 (1996) reprinted in 1996 U.S.C.C.A.N. 924, 925-26, 930-35. Thus, when viewed solely against the backdrop of congressional intent as set forth in the relevant legislative history, the District Court's restitution order with respect to the victims' furniture appears to be appropriate. This Court, however, has interpreted more narrowly these broad statements of congressional intent:

> [T]here is no doubt that the VWPA does not necessarily authorize a sentencing court to order restitution in an amount that represents a victim's entire loss. See Hughey v. United States, 495 U.S. 411, 413 (1990). Congress simply did not write the VWPA to fully satisfy the more ambitious purpose expressed in the legislative reports upon which [the government] relies. The plain and unambiguous language of S 3663(b)(1) clearly limits the amount of restitution to the value of the lost property.

_____

2. The language of S 3663(b)(1) (the VWPA) and S 3663A(b)(1) (the relevant portion of the MVRA) is identical in all relevant respects. Therefore, absent unique and highly persuasive MVRA legislative history, of which there is none, Third Circuit cases interpreting the language of the S 3663(b)(1) control in this case.

Government of the Virgin Islands v. Davis, 43 F.3d 41, 46 (3d Cir. 1994). Thus, we cannot simply defer to the sweeping language in the MVRA's legislative history in deciding whether the District Court exceeded its statutory authority by ordering restitution in an amount equal to the "replacement value" of the victims' fur niture.

Looking, however, at the plain language ofS 3663A, it states that a district court judge must awar d restitution to victims in an amount equal to "the value of the property on the date of the damage, loss, or destruction." 18 U.S.C. S 3663A(b)(1)(B)(i)(I). While the statute does not expressly define "value" as "replacement value," neither does it define value as "market value." In fact, the statute is silent as to which of these two measures should be used to determine the value of the victims' furniture. Ultimately, we are presented with a statute (the primary and overarching goal of which is to make victims of crime whole, to fully compensate these victims for their losses and to r estore these victims to their original state of well-being) that expressly directs the sentencing judge to award restitution in an amount equal to "the value of the pr operty on the date of the damage, loss, or destruction."

Although we have yet to decide whether the ter m "value" as used in S 3663A contemplates a restitution order based on "replacement value" rather than "fair market value," the Eleventh Circuit recently addressed this very question, concluding that "value" in S 3663A "contemplates a restitution order based on replacement cost where actual cash value is unavailable or unreliable." See Shugart, 176 F.3d at 1375. Moreover, the court in Shugart concluded that, in some situations, replacement value is an appropriate measure of "value" underS 3663A. Id.

The Shugart court, in attempting to deter mine the appropriate measure of "value" underS 3663A(b)(1) for a church burned down by the two defendants, reasoned that:

> Section 3663A(b)(1) requires the defendants to pay restitution in an amount equal to the "value" of the Church on the day they burned it down. For fungible commodities, value is easy to determine: it's the actual cash value, or fair market value, of the item--that is,

8

> "[t]he fair or reasonable cash price for which the
> property could be sold in the market in the or dinary
> course of business." BLACK'S LAW DICTIONARY 35 (6th ed.
> 1990). According to the defendants, S 3663A always
> limits restitution to actual cash value. . . . We disagree.
>
> Although fair market value will often be an accurate
> measure of the value of property, it will not always be
> so. Where actual cash value is difficult to ascertain--
> because an item is unique, or because there is not a
> broad and active market for it--replacement cost may
> be a better measure of value.

Id. While there is no indication that the destroyed furniture
in this case was "unique," furnitur e often has a personal
value to its owners that cannot be captured or accurately
estimated by simply determining the market value of the
furniture. Replacing the armchair one sits upon each
evening or the bed one sleeps in each night with fur niture
that others have already used may be difficult to accept.
This would be necessary, however, if the household
furniture is replaced at its market value because damaged
furniture cannot be replaced at market value with
equivalent new items. For that reason, when evaluating
personal items of furniture in one's r esidence, we find that
replacement value may be an appropriate measure of
"value" under S 3663A(b)(1). In these circumstances, the
market value or cash value is an inadequate or inferior
measure of "value."

This interpretation of "value," as the term is used in
S 3663A(b)(1), is not only consistent with the Shugart
court's reasoning and with the clear legislative intent
behind the MVRA, but also with the U.S. Sentencing
Guidelines and with other cases addressing the issues of
restitution and loss valuation where value is difficult to
ascertain.3 Moreover , this interpretation of "value" is

_____

3. See United States v. Sharp, 927 F .2d 170, 173 (4th Cir. 1991) (holding
that the replacement cost of a ventilation fan destroyed when two
defendants bombed a mine was properly awar ded as restitution to
victims of the bombing under 18 U.S.C. S 3663(b)(1)); cf. United States v.
Akbani, 151 F.3d 774, 779-80 (8th Cir. 1998) ("[I]n cases that result in

9

consistent with 18 U.S.C. S 3664, the statutory provision immediately following S 3663A, which per mits a sentencing court to order "in-kind" restitution"in the form of replacement of property." 18 U.S.C. S 3664(f)(4)(B) (emphasis added). We hold, therefor e, that the District Court properly considered "replacement value" as a measure of restitution and that it did not abuse its discretion under the circumstances of this case in then choosing it as the applicable measure in its award.

We conclude by noting that the rule of lenity is inapplicable in this case. As the Shugart court stated:

> We only invoke the rule of lenity when, after considering the structure and purpose of a criminal statute, we are left with nothing more than a guess as to what Congress intended. See United States v. Wells, 519 U.S. 482, 498-99 (1997). In this case, we see no "grievous ambiguity" sufficient to r equire application of the rule of lenity. Chapman v. United States, 500 U.S. 453, 463 (1991) (quoting Huddleston v. United States, 415 U.S. 814, 831 (1974)).

Shugart, 176 F.3d at 1376. Similarly, in the present case, we are not left with "nothing more than a guess as to what

_____

damage to or loss or destruction of property, .. . [t]he language of the Victim and Witness Protection Act("VWPA") . . . restricts restitution . . . to the replacement value of the property." (citing 18 U.S.C. S 3663(b)(1));
United States v. Pemberton, 904 F.2d 515, 516-17 (9th Cir. 1990) ("Being unique, the drawings were not fungible items for which there was a broad and active market; [i]n the absence of such a market, which would have supplied a readily ascertainable price, the court acted reasonably in relying upon the contract between Comstock's employer and the developer, the only parties with an immediate interest in the drawings, as an indication of value."); U.S. Sentencing Guidelines Manual S 2B1.1, application note 2 (1990) ("Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as r easonable replacement cost to the victim."); U.S. Sentencing Guidelines ManualS 2Q2.1, application note 4 (1995) ("Where the fair-market retail price is difficult to ascertain,
the court may make a reasonable estimate using any reliable information, such as the reasonable r eplacement or restitution cost or the acquisition and preservation (e.g., taxider my) cost.").

10

Congress intended." Both the statutory language and the legislative history of the VWPA and the MVRA clearly indicate Congress's intent to make victims of crime whole, to fully compensate these victims for their losses, and to restore these victims to their original state of well-being. In light of the clear, overarching goal of S 3663A, there is not only no "grievous ambiguity" with respect to Congress's intent, there is also no reason to conclude that the District Court abused its discretion here by opting for the replacement value of the victims' furniture rather than the market value.

2. The "Clean Renewal Discount" and "No Claim Discount"

Having concluded that the District Court properly included the depreciation attributable to the victims' furniture in its restitution or der, we must now determine whether the District Court erred by including in its restitution order the amount of the victims' lost "clean renewal discount" and "no claim discount." Because the victims' lost insurance premium discounts do not constitute "property" that was damaged lost or destroyed by the criminal acts of Simmonds and his co-defendants, we will reverse the District Court's restitution order with respect to these amounts.

The victims' "clean renewal discount" and "no claim discount" refer to the amount of money (in the form of lower home owners insurance premiums) that the victims would have saved had they not been forced to file an insurance claim for the fire damage r esulting from the arson committed by Simmonds and his co-defendants. In arguing that the District Court erred in ordering restitution for the value of the victims' lost insurance pr emium discounts, Simmonds contends that the plain language of the controlling statute, 18 U.S.C. S 3663A(b)(1), allows the District Court to award restitution only in an amount representing the value of property lost or destroyed as a result of the defendant's criminal activity. Simmonds further contends that neither the victims' "clean renewal discount" nor their "no claim discount" is property that was lost, damaged or destroyed as a result of Simmonds' crimes.

11

As we have previously interpreted the ter m "property" in S 3663A(b)(1), it does not include consequential damages. See Government of the Virgin Islands v. Davis, 43 F.3d 41 (3d Cir. 1994). In Davis, the defendant, who pled guilty in federal district court to charges of conspiracy to commit fraud, forgery, and perjury, argued on appeal that the district court improperly ordered as restitution the amount of legal fees incurred by the victim to r ecover property fraudulently obtained by the defendant. In r eviewing the district court's restitution order , the Davis Court, highlighting the controlling statutory language, concluded that S 3663(b)(1) expressly limits r estitution to the value of the property that was damaged, lost or destr oyed during or as a direct result of the criminal acts in question. Relying on opinions from the Fourth, Fifth, Seventh, Ninth and Tenth Circuits holding that "r estitution under the VWPA cannot include consequential damages,"4  the Davis Court held that consequential damages, such as attor neys' fees, are not recoverable in restitution under S 3663(b)(1). Davis, 43 F.3d at 46.

Consistent with our holding in Davis, we conclude that the District Court erred by including the value of the victims' "clean renewal discount" and"no claim discount" in its restitution order. The victims' lost insurance premium discounts are unquestionably a result of the defendant's criminal conduct. However, under S 3663A as we have interpreted it, the victims' lost insurance pr emium discounts are consequential damages and do not in any way constitute or represent "the value of the property" lost, damaged or destroyed as a result of Simmonds's crimes. The District Court exceeded its statutory authorization in ordering restitution for the victims' lost"clean renewal discount" and "no claim discount," and we will, therefore, reverse the District Court's grant of r estitution with respect to these items.

_____

4. See United States v. Mullins, 971 F .2d 1138, 1147 (4th Cir.1992); United States v. Arvanitis, 902 F.2d 489, 497 (7th Cir.1990); United States v. Barany, 884 F.2d 1255, 1261 (9th Cir. 1989); United States v. Patty, 992 F.2d 1045, 1049 (10th Cir .1993); United States v. Mitchell, 876 F.2d 1178, 1184 (5th Cir.1989).

B. Imposition of Consecutive Sentences

Simmonds next argues that the District Court abused its discretion by ordering his territorial sentence to run consecutively, rather than concurrently, with his federal sentence. Simmonds contends that the District Court was required to determine whether "the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment," U.S. Sentencing Guidelines Manual S 5G1.2(c) (2000),5 and to consider the factors enumerated in 18 U.S.C. S 3553, including the need for deterrence, punishment and restitution, the nature and seriousness of the offense, the kinds of sentences available for the crime in question and similar crimes, the need to protect the public, and the need for criminal r ehabilitation, before ordering his territorial sentence to run consecutively (rather than concurrently) to his federal sentence. See 18 U.S.C. SS 3584, 3553 (2000). Simmonds contends that because the District Court failed to apply U.S.S.G.S 5G1.2 and to consider the factors enumerated in S 3553(a), his sentence must be vacated and his case remanded to the District Court for re-sentencing.

We have previously held that the Sentencing Guidelines do not apply to sentences for violations of V irgin Islands territorial law. See Government of the V irgin Islands v. Dowling, 866 F.2d 610, 613-15 (3d Cir . 1989). The Sentencing Guidelines apply only to sentences for federal criminal violations and do not apply to sentences for territorial criminal violations regardless of whether such sentences are imposed by the District Court for the Virgin Islands or the Virgin Islands T erritorial Court. See id. In the present case, however, we are called upon to address a more nuanced question. We must deter mine whether the factors, set forth at 18 U.S.C. S 3553 andS 5G1.2 of the Sentencing Guidelines, apply when federal and territorial criminal charges are joined for trial and sentencing in the

_____

5. U.S.S.G. S 5G1.2(c) provides that"[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise r equired by law." U.S. Sentencing Guidelines Manual S 5G1.2(c) (2000).

13

District Court for the Virgin Islands. 6 As detailed below, we conclude that as a matter of law neither S 3553 or S 5G1.2 applies in such a situation. We hold, ther efore, that the District Court properly did not apply the Guidelines in its imposition of the sentence for the territorial of fense and that, when the District Court ordered Simmonds to serve consecutive rather than concurrent sentences for his crimes without reference to S 3553 or S 5G1.2, it did not abuse its discretion.

At oral argument, Simmonds urged that 48 U.S.C. S 1614(b) (which mandates that certain federal criminal procedures be applied in the District Court for the Virgin Islands) required that the District Court consider at sentencing the factors set forth in 18 U.S.C. S 3553(a). We disagree. As Simmonds concedes, if the District Court were required, pursuant to 48 U.S.C. S 1614(b), to consider the factors set forth in S 3553(a) when deciding whether his sentence for burglary should run consecutively or concurrently to his federal sentence for arson, then the District Court would also be required to apply the Sentencing Guidelines when deciding this issue. See 18 U.S.C. S 3553(a)(4)(A), (a)(5), and (b). Specifically, sections 3553(a)(4) and 3553(a)(5) state that a sentencing court must consider both "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to S 944(a)(1) of title 28," 18 U.S.C. S 3553(a)(4), and "any pertinent policy statement issued by the Sentencing Commission . . . that is in effect on the date the defendant is sentenced." 18 U.S.C. S 3553(a)(5). Moreover, 18 U.S.C.S 3553(b) introduces additional factors to be considered:

> The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degr ee, not adequately taken into consideration by the Sentencing

---

6. The Sentencing Guidelines do apply of course in computing the sentence imposed for the federal arson conviction.

14

> Commission in formulating the guidelines that should
> result in a sentence different fr om that described.

18 U.S.C. S 3553(b).

If, therefore, S 3553 had been applicable when a sentence was being imposed on Simmonds for his conviction on the territorial offense, the District Court would also have been required to apply S 5G1.2 of the Sentencing Guidelines and to impose a total sentence within the range established for the adjusted combined offense level. However , pursuant to our holding in Dowling, the Sentencing Guidelines do not apply with respect to territorial criminal of fenses tried in the District Court of the Virgin Islands. See Dowling, 866 F.2d at 615.

Moreover, S 5G1.2 of the Guidelines, entitled "Sentencing on Multiple Counts of Conviction," is applicable to sentencing on multiple federal counts of conviction. That this section is so limited can be ascertained fr om its reference to Part D of Chapter 3 of the Guidelines, "Multiple Counts," which in turn makes it clear in its Introductory Commentary that Part D is establishing methods of determining a single offense level when there are multiple offenses of conviction under Chapter 2 of the Guidelines. All offenses under Chapter 2 are violations of federal –– not of state or territorial –– statutes.7

_____

7. Although the Government argues that S 5G1.3, "Imposition of a Sentence on a Defendant Subject to an Undischar ged term of Imprisonment," is not applicable in this case to determine whether the sentences should be consecutive or concurrent, it would seem that in fact S 5G1.3 would be the appropriate Sentencing Guideline section to consult when sentences for federal and for state/territorial offenses cover
related conduct. For example, Application Note 2 to S 5G1.3 discusses how to compute a federal sentence which may take into account, as Relevant Conduct, conduct for which a defendant has been convicted and sentenced in state court. If Simmonds had committed his offenses in a state rather than in a territory, he would have pled guilty in state court to the state burglary offense and in federal court to the federal arson offense and S 5G1.3 would have been applicable to determine if the federal sentence should run concurrently with or consecutively to the state sentence. See United States v. Brown, 920 F.2d 1212, 1216–17 (5th Cir. 1991) (holding that a federal district court can require its sentence

15

Moreover, although 48 U.S.C. S 1614(b) states that "[w]here appropriate, the pr ovisions of part II of Title 18 [Criminal Procedure] and of T itle 28 . . . shall apply to the district court and appeals therefrom," the applicability of part II of Title 18 is set forth in the following terms: "Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provision of this chapter." 18 U.S.C.S 3551(a). Thus, the scope of part II of Title 18 is defined in terms of sentences imposed for violations of federal law, not in terms of sentences imposed in federal courts.

Our conclusion that the Sentencing Guidelines and the factors set forth in 18 U.S.C. S 3553 do not apply in this case is reinforced by the policy considerations addressed in Dowling. In rejecting the suggestion that the Sentencing Guidelines and the Sentencing Reform Act apply to sentences for territorial violations imposed by the District Court of the Virgin Islands but not to sentences for territorial violations imposed by the Vir gin Islands Territorial Court, we noted in Dowling that "if the [Sentencing] Guidelines must be used in one court but not in the other, the prosecutor would have the option of choosing what range of punishment could be imposed for the particular crime" simply by selecting the appropriate court in which to bring charges. Dowling , 866 F.2d at 613. We reasoned that it "would be an anomalous situation, out of the mainstream of criminal law administration," to permit such forum shopping. Id. Because we concluded that the Sentencing Guidelines and the Sentencing Reform Act did not apply to sentences handed down by the V irgin Islands Territorial Court, we ultimately held that they likewise did not apply to sentences imposed by the District Court of the Virgin Islands for violations of Virgin Islands territorial law (in contrast to federal law). See id. at 615.

_____

to be served consecutively with a yet to be imposed state sentence). It is only because uniquely in the Virgin Islands a defendant can be convicted of both the federal and the territorial offenses at the same time in federal court that the application of S 5G1.3 in such a situation is even debatable.

16

Because the Sentencing Guidelines and the Sentencing Reform Act do not apply in this case to the territorial violation, they cannot be reintroduced into the sentencing process by requiring that computation of the total sentence for the federal and territorial offenses be determined under the Guidelines. We must consider the two sentences separately. In regard to the sentence for the territorial offense, the laws of the Virgin Islands do not impose express limitations on a sentencing court's discretion to impose consecutive sentences for territorial criminal offenses. Furthermore, the laws of the Virgin Islands do not require specific factors to be consider ed when imposing consecutive sentences for territorial criminal of fenses.

Here, in deciding to impose consecutive sentences, the District Court stated at the sentencing hearing that it did not believe that the 97 months on the federal arson count adequately achieved "the total punishment that is necessary and appropriate in this case." (App. at 57). Moreover, in discussing other aspects of its sentencing decision, the District Court emphasized that Simmonds was responsible for recruiting Gumbs, that Simmonds carried a gun during the burglary, that Simmonds gave Gumbs a gun to carry during the commission of the bur glary, and that Simmonds and Gumbs were the only individuals who stayed behind to set the fire. (App. at 28-30). In addition, the District Court explicitly addressed the seriousness of the offense:

> It is a very just--entering someone's house, and even when you think they're not there is bad enough, just a regular burglary.

> But then, when inside the house, it is found out that it's owned by a federal official and a federal law enforcement official, a prosecutor , and because of that role, that job, the burglars escalate the crime to one of arson, and they don't just set fire to the place, they . . . set a bomb, in essence, by setting fire to a piece of furniture and turning the gas on, it was only a matter of time that there would have been a massive explosion.

> And it is only by chance, the grace of God, however you wish to characterize it, that someone . . . first went in

17

. . . [and] turned the gas off and attempted to fight the fire until the firefighters arrived.

And that's what makes this crime so particularly disturbing and so particularly an heinous one, and deserving of a level of punishment for one such as Mr. Simmonds who played a managerial or supervisory r ole in the arson itself, as well as, of course, the initial enterprise of the burglary.

(App. at 55-56). The District Court also noted that Simmonds tried to elude the police after fleeing the scene of the crime. (App. at 56).

In sum, the District Court clearly articulated r easons supporting its conclusion that the sentences should run consecutively. As such, we hold that the District Court did not abuse its discretion in its sentencing decision.

C. Consultation of Other Pre-Sentence Investigation
       Reports

Simmonds finally argues that "[t]he trial court violated [his] right to due process by taking into account material included in the Pre-Sentence Investigation Reports ("PSI's") of other participants." Simmonds contends that these reports were not provided to him and that "he had no opportunity to respond" to the infor mation contained in these reports prior to the District Court's decision to make a three-point upward adjustment in his base offense level for playing a leadership, managerial and/or or ganizational role in the crimes to which he pled guilty.

Although Simmonds contends that he objected to the District Court's decision to consult his co-defendants' PSI's, our careful review of the sentencing transcript belies this contention. While Simmonds did object to the District Court's decision to impose a three-point upwar d adjustment in his base offense level for playing a leadership role in the crimes to which he pled guilty, it is clear from the sentencing transcript that neither Simmonds nor his lawyer objected to the District Court's consultation of or reliance upon the PSI's of Simmonds's co-defendants.

Simmonds does not contend that the information in his PSI or in the PSI's of his co-defendants was unr eliable or

18

untrustworthy. Instead, Simmonds contends only that the District Court violated his due process rights by consulting his co-defendants' PSI's prior to sentencing him and that the facts presented in these PSI's, when considered together with the facts in Simmonds's own PSI, demonstrate that Simmonds "was not a leader, organizer, manager or supervisor."

We note, however, that the following sections of the PSI's of all five defendants are identical: Related Cases, The Offense Conduct, Defendants' Statement Regar ding the Planning of the Offense, Defendants' Statement Regarding the Burglary, Defendants' Statement Regar ding the Arson, and Victim Impact Statement. Therefor e, any error in reviewing the co-defendants' PSI's would be har mless because the relevant information is the same in each of them. Moreover, even a cursory r eview of Simmonds's own PSI provides ample support for the District Court's conclusion that Simmonds acted as a leader, manager and/or organizer.

In arguing, furthermore, that the District Court violated his due process rights by denying him access to his co-defendants' PSI's, Simmonds acknowledges that, as a general rule, criminal defendants have no right to see or examine the PSI's of their co-defendants. See, e.g., United States v. Blanco, 884 F.2d 1577, 1577-78 (3d Cir. 1989) (citing United States Dep't of Justice v. Julian , 486 U.S. 1 (1988)). Furthermore, as Simmonds concedes in his brief, "the scope of what a trial court may consider in determining a[n appropriate] criminal sentence is breathtakingly broad." Not only have we held that a federal district court judge has almost unlimited discr etion in determining the appropriate sentence in a criminal case, see, e.g., United States v. Stephens, 198 F.3d 389, 391 (3d Cir. 1999), such discretion is a part of federal statutory law. See 18 U.S.C. S 3661 ("No limitation shall be placed on the information concerning the backgr ound, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); see also U.S. Sentencing Guidelines S 1B1.4 (2000) ("In determining the sentence to impose within the guideline range, or

19

whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").

Given the District Court's broad discretion to consider relevant information when sentencing a criminal defendant, we conclude that the District Court's decision to consult the PSI's of Simmonds's co-defendants did not constitute plain error.

IV. CONCLUSION

In conclusion, we will affirm the District Court's judgment of sentence except for the inclusion of the value of the victims' lost insurance premium discounts in the restitution order. We r emand this case to the District Court so that Simmonds may be resentenced as to r estitution.

20

STAPLETON, Circuit Judge, concurring and dissenting:

I join all portions of the Court's opinion other than Part III(A)(1). Because I conclude that the portion of the District Court's restitution order regar ding the destroyed furniture exceeded its authority, I would remand for r esentencing.

Because the victims' insurance company, in accor dance with the terms of its policy, paid only the depreciated value of the furniture, the District Court or dered that the defendants pay the victims an amount equal to the depreciation they failed to receive fr om the carrier. The record does not explain how this depr eciation was calculated, but my colleagues appear to assume that receiving an amount equal to the depreciation would put the victims in a position to replace the lost furniture with new furniture at the time of the loss. They thus refer to this as the victims receiving "replacement value."

Section 3663A(b)(1)(B) mandates restitution in the amount of the greater of the value of the pr operty destroyed at the time of the loss or at the time of sentencing. The value of lost property is most commonly r egarded as being the market value of the property, i.e., what a willing buyer would pay. Compare BLACK'S LAW DICTIONARY 1549–50 (7th ed. 1999) (defining "value" as "the amount of goods, services, or money that something will command in an exchange" and both "market value" and "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's–length transaction . . . ." while making no reference to"replacement value"), with id. at 349–50 (defining "replacement cost" as "[t]he cost of acquiring an asset that is as equally useful or productive as an asset currently held"). Thus, if the phrase is read literally, the value of the lost furnitur e is not the same as the value of new furniture.

Even if one assumes that the value of the new fur niture is an acceptable reading of the value of the lost property, there is at least an ambiguity here on the face of the statute. The Court concedes that the ambiguity is not specifically resolved by the legislative history. As the Court acknowledges, this conclusion is requir ed by our holding in Government of the Virgin Islands v. Davis, 43 F.3d 41, 46 (3d Cir. 1994).

21

The Court ultimately holds that the admitted ambiguity is resolved by the general, overall purpose of the statute.1 This holding is in direct conflict, however , with the teaching of the Supreme Court in Hughey v. United States, 495 U.S. 411 (1990). Pursuant to a plea agreement, Hughey pleaded guilty to one count of fraud in exchange for the government's agreement to dismiss the r emaining counts. The government sought restitution pursuant to the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. SS 3579, 3580, for damages stemming fr om all crimes with which Hughey had been charged, not simply the charge to which he had pleaded guilty. The Supreme Court held that the plain language of the VWPA limited r estitution orders to the harms flowing only from the of fense of which the defendant had been convicted. Most important for our purposes, the Supreme Court held that no appeal to "the expansive declaration of purpose accompanying VWP A," id. at 420, was warranted because "[e]ven wer e the statutory language regarding the scope of a court's authority to order restitution ambiguous, longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant . . . preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history," id. at 422.

_____

1. The Court's references to various r estitution cases and to the Sentencing Guidelines in its footnote 3 are inapposite. In United States v. Sharp, 927 F.2d 170, 174 (4th Cir . 1991), the court held that lost income and costs of repairing a damaged mine were included in the restitution calculation. The defendants conceded that the replacement cost of a fan was properly included in the r estitution order, and, therefore, the court in Sharp did not have occasion to consider the propriety of so doing. The court in United States v. Akbani, 151 F.3d 774, 779-80 (8th Cir. 1998), held that S 3663(b)(1) did not apply. Therefore, any pronouncement on the permissibility of replacement value in restitution orders is dictum. Sentencing Guidelines SS 2B1.1 & 2Q2.1 both calculate "value" to determine a crime's significance. Value in this context is irrelevant to our effort to determine how much Congress is requiring the defendant to pay the victims in r estitution. United States v. Pemberton, 904 F.2d 515 (9th Cir. 1990), a Guidelines case and not a restitution case, is similarly irrelevant.

22

The rule of lenity, accordingly, would mandate that we construe any ambiguity in S 3663A(b)(1)(B) in favor of Simmonds. The Court's resolution of the ambiguity in favor of a more, rather than less, expansive definition of "value" is fundamentally inconsistent with the rationale behind the rule of lenity.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23